EXHIBIT B

COMPLAINT TO TRANS UNION, LLC

STATE OF MINNESOTA          DISTRICT COURT

COUNTY OF HENNEPIN         FOURTH JUDICIAL DISTRICT

|  |  |
|---|---|
| Taylor Ryan Nelson,<br><br>         Plaintiff,<br><br>v.<br><br>Equifax Information Services LLC,<br><br>Experian Information Solutions, LLC, and<br><br>Trans Union LLC,<br><br>         Defendants. | Court File No. _____<br>Judge:<br>Case Type: Ohter<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

1.  This Fair Credit Reporting Act ("FCRA") action for damages involves Plaintiff's ordeal in dealing with a recurring problem at the three major credit bureaus:  the merging of two consumers' credit files.  Each Defendant's long history of creating "mixed files" has been the subject of numerous private lawsuits and multiple government enforcement actions over a span of more than twenty years.  Plaintiff's claims are based on Defendants' false reporting on Plaintiff's credit reports, failures to follow reasonable procedures for accuracy, failures to conduct reasonable investigations of disputed information, failures to provide Plaintiff with copies of his credit reports, and impermissible dissemination of Plaintiff's information to creditors who sought credit reports on the other consumer.

## PARTIES

2.    Plaintiff Taylor Ryan Nelson is a natural person who resides in the city of Plymouth, County of Hennepin, State of Minnesota, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3.    Defendant Equifax Information Services LLC ("Equifax") is a credit bureau doing business in Minnesota and is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

4.    Defendant Experian Information Solutions, Inc. ("Experian") is a credit bureau doing business in Minnesota and is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

5.    Defendant Trans Union LLC ("Trans Union") is a credit bureau doing business in Minnesota and is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

6.    This is a case of defendant credit bureaus creating mixed files.

7.    A mixed file is a situation where a consumer reporting agency ("CRA") such as Equifax, Experian, or Trans Union places information relating to one consumer in the credit file of another, thus creating false descriptions of both consumers' credit histories in their respective credit reports.

2

8.    Mixed files occur most often when two or more consumers have similar names, Social Security numbers, or other identifiers (for example, when information relating to John J. Jones is put in John G. Jones' file).

9.    Mixed files occur largely because CRAs' computers do not use sufficiently rigorous thresholds to match consumer data precisely, even when such unique identifiers as Social Security numbers are present: for example, Equifax relies on a match of only seven of nine digits of the SSN.

10.   Creditors furnish information on their credit and collection accounts to Equifax, and each account record or "tradeline" will include identifying information such as name, Social Security number, address, and birth date. Equifax organizes furnisher records into "files," which refer to all credit accounts and other information that Equifax deems as belonging to the same person. Upon receipt of each account tradeline, Equifax uses an automated matching system that has been preprogrammed with defined rules. The Equifax computer attempts to find in its database the existing credit file that most closely matches the identifying information in the reported tradeline. An account with the same full Social Security number, consumer name, and address as an existing file would constitute a perfect match, but Equifax will allow a tradeline that only constitutes a partial match to be reported to a file.

11.   As explained by the Federal Trade Commission, CRAs have a financial incentive for over-inclusive matching procedures:

3

> When Congress passed the FCRA, it was responding in part to consumer concerns that the CRAs overemphasize completeness at the expense of accuracy. Many of the CRAs' customers are lenders, whose main concern in consulting a consumer report is assessing the likelihood that a borrower will default. For many lenders, the loss incurred when a borrower defaults is much larger than the profit earned when a borrower repays a loan. Because of this, lenders may prefer to see all potentially derogatory information about a potential borrower, even if it cannot all be matched to the borrower with certainty. This preference could give the CRAs an incentive to design algorithms that are tolerant of mixed files, which could harm consumers to whom derogatory information is mistakenly assigned.

Fed. Trade Comm'n, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, 47 (Dec. 2004).

12.   Mixed files can be hard for consumers to detect:  a mixed file can look like identity theft.

13.   As experts have explained, not only do the CRAs have an incentive to be over-inclusive, but also they have little marketplace counter-incentive to exercise care with respect to avoiding and correcting inaccuracies generally:

> [T]he credit reporting industry is unlike most other industries in some fundamental respects. . . . .[T]he paying clients of the credit reporting industry are not consumers, but the creditors who furnish or use the information contained in the credit bureaus' databases. . . .
>
> [C]onsumers have no say in whether their information is included in the credit bureaus' databases. . . . . Thus, unlike almost all other business relationships, consumers who are unhappy with the actions of a credit bureau cannot vote with their feet – they cannot remove the information or take their business elsewhere.
>
> Creditors, in contrast, do have the ability to switch between credit bureaus if they wish. . . . Credit bureaus have no interest in deferring to a consumer involuntarily captured in a relationship with

4

the bureau, when doing so could cause its paying customer to lose collection opportunities and profits. Both furnishers and credit bureaus also benefit from a system that allows them to spend only seconds on a dispute rather than the time (even if minimal) required to actually resolve it.

Thus, traditional competitive market forces provide little incentive for credit bureaus to incur the costs of instituting new procedures that ensure information is accurate or to undertake investigations to correct errors . . . . Only the FCRA itself compels such behavior.

However, the risk of an occasional FCRA lawsuit appears not to have overcome these economic incentives. The result is persistent inaccuracies in credit reports . . . . Until the failure to conduct a real investigation becomes more expensive than the savings from these cost reducing measures, the current system will remain broken.

Chi Chi Wu, National Consumer Law Center, *Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in Their Credit Reports (Jan. 2009)* https://www.nclc.org/images/pdf/pr-reports/report-automated_injustice.pdf .

14. At least until recently, when information is disputed to, for example, Equifax, the company has spent less than $1 to process each dispute, despite the fact that failure to correct inaccurate information could cost consumers thousands of dollars and countless hours of aggravation.

15. The "investigation" process is largely automated, and at least until recently, Equifax outsourced the human part of the investigation to contractors in Costa Rica, India, or the Philippines.

5

16. Equifax and the other CRAs have been on notice from numerous cases of the ongoing problem of mixed files.

17. Government agencies have also repeatedly put Defendants on notice of their shortcomings with respect to mixed files and have repeatedly attempted to get Defendants to take greater care with respect to accuracy: for example, in the 1990s, an FTC investigation of Equifax resulted in a consent order addressing a number of problems, including mixed files. *See In the Matter of Equifax Credit Information Services, Inc.*, 120 F.T.C. 577, 1995 WL 17012660.

18. The 1995 Equifax Consent Order ordered:

> That Equifax, in connection with the collection, preparation, assembly, maintenance and furnishing of consumer reports and files, forthwith cease and desist from failing to:
>
> ...
>
> 4. Follow reasonable procedures to assure maximum possible accuracy of the information concerning the consumer about whom the consumer report relates, as required by Section 607(b) of the FCRA [15 U.S.C. § 1681e(b)]. Such procedures shall include but are not limited to reasonable procedures:
>
> ...
>
>> b. To prevent reporting to subscribers that credit information pertains to a particular consumer unless Equifax has identified such information by at least two of the following identifiers: (i) the consumer's name, (ii) the consumer's Social Security number, (iii) the consumer's date of birth, (iv) the consumer's account number with a subscriber or a similar identifier unique to the consumer; [with exceptions that do not apply]
>>
>> ...
>>
>> d. To prevent furnishing any consumer report containing information that Equifax knows or has reason to believe is incorrect, including information that the consumer or the

6

source or repository of the information has stated is not
accurate (including that it does not pertain to the consumer)
unless Equifax has reason to believe that the statement is
frivolous or irrelevant or, upon investigation, not valid;
e. To avoid the occurrence of mixed files, including but not
limited to mixing of files as the result of entry of data by
subscribers when seeking consumer reports.

*Id.* at 586-87.

19.   Similarly, an FTC investigation of TRW (now known as Experian) resulted in a

consent order addressing a number of problems, including mixed files. *See FTC v.*

*TRW INC.*, 784 F.Supp. 361 (N.D. Tex. 1991).

20.   The 1991 Experian Consent Order enjoined Experian (then known as TRW)

from failing to:
1. Maintain reasonable procedures to prevent the occurrence or
reoccurrence of Mixed Files, including but not limited to:
a. Continuing its current efforts to improve its information
gathering, storing, and generating systems to reduce the
occurrence of Mixed Files, through modification of its
software system to enable such system to accommodate and
use, for matching and identification purposes, a Consumer's
Full Identifying Information.

*Id.* at 362.

21.   "Full Identifying Information" was defined as, "full last and first name; middle

initial; full street address; zip code; year of birth; any generational designation; and

social security number." *Id.*

22.   Similarly, and action brought by seventeen state attorneys general against Trans

Union resulted in a consent order addressing a number of problems, including mixed

7

files. *See Alabama v. Trans Union Corp.*, Civil Action No. 92C 7101 (N.D. Ill. Oct. 26, 1992).

23. In the 1992 Trans Union Consent Order, Trans Union agreed to "Implement or continue to utilize and maintain reasonable procedures to avoid the occurrence or reoccurrence of Mixed Files."

24. Defendants have known about the mixed file problems caused by partial SSN matches for over twenty-five years, yet apparently have not substantially changed their practices.

25. Defendants have violated the terms of the 1990s consent orders.

26. Defendants mixed Plaintiff's credit file with that of a different person, whose name is Taylor Justin Nelson ("Mr. Nelson").

27. Plaintiff and Mr. Nelson have the same first and last name, but have different middle names, different addresses, and different – albeit similar - social security numbers.

28. Plaintiff has never gone by "Taylor J. Nelson" or "Taylor Justin Nelson."

29. Plaintiff was not aware of any reason that his credit report would have been accessed by lenders.

30. Plaintiff obtained his Trans Union credit report on June 14, 2019.

31. Plaintiff noticed incorrect information being reported on his credit report. The Trans Union credit report contained numerous credit accounts, home addresses and addition information that did not belong to Plaintiff.

8

32.     The credit report contained credit accounts for Boeing Employees Credit Union, Prosper Marketplace, Sofi Lending, Washington State ECU, Comenity Bank, Discover Personal Loans, SYNCB, Paypal, and University Accounting. None of these accounts belonged to Plaintiff.

33.     Several of the accounts were described as "Adverse Accounts," meaning that the accounts were not paid according to the terms of the various credit agreements.

34.     When Plaintiff first saw all those strange accounts in his credit report, he was confused. In his entire life, he had only had one credit account with Highway Federal Credit Union, in Saint Paul, Minnesota, and that account was in perfect standing.

35.     In addition to the credit accounts, the names reported on the Trans Union credit report included "Taylor J. Nelson." Plaintiff has never used or gone by the name "Taylor *J.* Nelson." Plaintiff's middle name is Ryan or "R."

36.     The credit report contained many incorrect employers, telephone numbers and addresses. Specifically, the report listed numerous addresses in Marysville, Washington.

37.     Plaintiff never lived in Marysville, Washington. Plaintiff has only lived in Minnesota and North Dakota.

38.     Plaintiff was confused about why this incorrect information was reporting on his credit report. He was concerned and filed an online dispute with Trans Union through its website. In addition, Plaintiff called Trans Union to dispute the

9

information. These disputes alerted Trans Union to the errors on Plaintiff's credit file and the fact that Trans Union was mixing Plaintiff's credit file with another consumers.

39.   Trans Union did not fix or remove the inaccurate information reporting on Plaintiff's credit report and did not take action to stop the mixing of Plaintiff's credit file with the other consumer, Mr. Nelson.

40.   On August 12, 2019, Plaintiff attempted to purchase a new car at Second Richfield Motors LLC in Richfield, Minnesota. Plaintiff had previously ordered the car and arrived at the dealership prepared to sign the purchase agreement and financing documents.

41.   When the finance associate at the dealership pulled the Plaintiff's credit reports and scores, it indicated that Plaintiff's credit score was approximately 520. The inaccurate, false, and derogatory information reporting on Plaintiff's credit reports from Equifax, Trans Union and Experian substantially reduced Plaintiff's credit score and credit standing.

42.   The finance associate informed Plaintiff, while he was sitting in the new car he had ordered, that he was unable to sell Plaintiff the car because Plaintiff's credit scores were way too low.

43. Plaintiff attempted to explain that he didn't have bad credit and only had one credit card in perfect standing in his entire life. The finance associate refused to believe Plaintiff and would not sell him the car.

44. Plaintiff left the dealership in his 13-year-old, used car. Plaintiff was humiliated, embarrassed, frustrated, depressed, and on the verge of tears. It was one of the lowest points in Plaintiff's life.

45. After the experience at the car dealership, Plaintiff immediately started attempting to – once again- fix the errors on his credit report. He ordered his credit reports from the credit bureaus.

46. Plaintiff received a credit report from Trans Union dated August 12, 2019, which contained all the incorrect personal information and credit accounts that the Plaintiff had previously disputed with Trans Union. Trans Union had not removed any of the inaccurate information.

47. Plaintiff received a credit report from Experian dated August 13, 2019.

48. The Experian credit report – like the Trans Union credit report – contained numerous, inaccurate, credit account and personal information.

49. The Experian credit report contained accounts from Boeing Employees Credit Union, Sofi Lending, Washington State ECU, Barclays Bank Deleware, Capital One, Comenity Bank, Discover Bank, Discover Financial Services, Prosper

11

Marketplace, SYNCB, and US Department of Education. Several of the accounts were "considered negative" because of their delinquent payment history.

50.     None of the credit accounts belonged to Plaintiff.

51.     The Experian credit report included in in accurate personal information, including "Taylor J Nelson," several addresses in Marysville, Washington, *two* Social Security number "variations," and incorrect former and current employers.

52.     Plaintiff reviewed his credit report from Equifax on August 13, 2019.

53.     Plaintiff's Equifax credit report contained inaccurate accounts, including a credit account from Comenity Capital/Dental Work, Boeing, Sofi Lending, SYNBC, among others. Plaintiff immediately disputed the inaccurate accounts online and by contacting Equifax by telephone.

54.     On or around September 21, 2019, Plaintiff received a response to his dispute. Equifax removed some of the inaccurate information, but in regard to the Comenity Capital account Equifax stated, "We verified that this item belongs to you." Equifax recommended that Plaintiff contact Comenity Capital if he had further questions.

55.     The Comenity Capital account did not belong to Plaintiff.

56.     Plaintiff's disputes alerted Equifax that a mixed file existed, and that Equifax should act to clear Plaintiff's credit file of inaccurate information.

57.     Through the next year, Plaintiff spent hours on the telephone with Equifax, Trans Union and Experian, attempting to fix the inaccuracies on this credit reports. In

addition, Plaintiff continued to write dispute letters to the Defendants and submit online disputes through Defendants' websites.

58.   On or around October 4, 2019, Plaintiff received a credit report from Trans Union. The credit report continued to report all the inaccurate information that Plaintiff had previously disputed. Plaintiff's credit file remained mixed with another consumer's file.

59.   On August 8, 2020, Plaintiff sent letters to Equifax, Experian and Trans Union – once again – disputing all the inaccurate information on his credit reports.

60.   On or around October 23, 2020, Plaintiff received a credit report from Equifax. The report continued to report the Comenity Bank, which didn't belong to Plaintiff. In addition, Equifax added additional accounts that didn't belong to Plaintiff, including a credit account for Credit One Bank. Plaintiff never had a Credit One Bank account.

61.   On January 6, 2021, Equifax began reporting on Plaintiff's credit file a Chapter 7 Bankruptcy filed in Seattle, Washington.

62.   Plaintiff has never filed for Chapter 7 bankruptcy and has never lived in Seattle, Washington.

63.   On January 4, 2021, Plaintiff faxed a letter to Equifax to dispute to dispute the inaccurate information on his report, including the bankruptcy.

64.   On or around January 14, 2021, Plaintiff received a response from Equifax regarding his dispute. In regards the bankruptcy, Equifax stated, "WE VERIFIED

13

THAT THIS ITEM BELONGS TO YOU." Equifax stated that the public record was provided by Lexis Nexis Consumer Center.

65. When Plaintiff tried to get his credit reports from Experian, Equifax and Trans Union, Experian, Equifax and Trans Union asked Plaintiff security questions based on information in Plaintiff's file that actually belonged to Mr. Nelson.

66. Because Plaintiff was unable to answer the security questions based on Mr. Nelson's information, Experian and Trans Union did not give Plaintiff copies of his credit reports.

67. From June 14, 2019 to the present, Plaintiff disputed to various consumer reporting agencies the information that was not his multiple times, including without limitation the disputes specified herein.

68. Due to Defendants' respective failures to conduct reasonable investigations of Plaintiff's disputes, the false information on Plaintiff's credit reports was not appropriately deleted or modified.

69. Equifax sold credit reports with a mix of Plaintiff's and another consumer's information to subscribers on multiple occasions, including without limitation on August 12, 2019 , to Global Lending Services, Inc.

70. Trans Union sold credit reports with a mix of Plaintiff's and another consumer's information to subscribers on multiple occasions, including without limitation on September 2, 2020, to Northwest Motorsport.

71.     Experian sold credit reports with a mix of Plaintiff's and another consumer's information to subscribers on multiple occasions, including without limitation on August 5, 2019, to Washington State Employees Credit Union.

72.     As a result of Defendants' actions and omissions, Plaintiff has suffered actual damages, including without limitation adverse credit actions, out-of-pocket expenses, detriment to his credit rating, and emotional distress.

73.     Plaintiff has suffered injuries in fact that are traceable to Defendants' conduct and that are likely to be redressed by a favorable decision in this matter.

74.     Specifically, Plaintiff suffered concrete injuries to his reputation as a result of Defendants' communication of false information to third parties.

75.     At all times pertinent hereto, Defendants acted by and through their agents, servants and/or employees who acted within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants.

**TRIAL BY JURY**

76.     Plaintiff is entitled to and hereby requests a trial by jury.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681e(b)**

15

77.   Defendants willfully and/or negligently violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer reports.

78.   As a result of Defendants' violations of § 1681e(b), Plaintiff has suffered actual damages, including without limitation credit denials, out-of-pocket expenses, detriment to his credit rating, invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

79.   Defendants' actions and omissions were willful, rendering them liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

80.   Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II
## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i

81.   Defendants willfully and/or negligently violated 15 U.S.C. § 1681i in multiple ways including without limitation by failing to conduct a reasonable reinvestigation of Plaintiff's dispute(s) and by failing thereafter to appropriately delete or modify information in Plaintiff's file..

82.   As a result of Defendants' violations of § 1681i, Plaintiff has suffered actual damages, including without limitation credit denials, out-of-pocket expenses,

detriment to his credit rating, invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

83.   Defendants' actions and omissions were willful, rendering them liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

84.   Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III
## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681g

85.   Defendants willfully and/or negligently violated 15 U.S.C. § 1681g by failing to disclose information in Plaintiff's file.

86.   As a result of Defendants violations of § 1681g, Plaintiff has suffered actual damages, including without limitation credit denials, out-of-pocket expenses, detriment to his credit rating, invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

87.   Defendants' actions and omissions were willful, rendering them liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

88.   Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C.
      §§ 1681n and 1681o.


**COUNT IV**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681b(a)**

89.   Defendants willfully and/or negligently violated 15 U.S.C. § 1681b(a) by providing
      Plaintiff's credit information to entities that sought to obtain Mr. Taylor J. Nelson's
      credit reports and had no permissible purpose for Plaintiff's credit report.

90.   As a result of Defendants' violations of § 1681b(a), Plaintiff has suffered actual
      damages, including without limitation invasion of privacy, and emotional distress.
      Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§
      1681n and 1681o.

91.   Defendants' actions and omissions were willful, rendering it liable for punitive
      damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

92.   Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C.
      §§ 1681n and 1681o.

**WHEREFORE,**

Plaintiff prays that judgment be entered against these Defendants for:

   a.) Plaintiff's actual damages;

   b.) Punitive and/or statutory damages pursuant to 15 U.S.C. § 1681n;

18

c.) Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or

1681o;

d.) Recovery of reasonable damages in an amount greater than $50,000 is sought;

and

e.) Such other and further relief as may be just and proper.

**HEANEY LAW FIRM, LLC**

Date: **June 11, 2021**

Mark L. Heaney
(MN #333219, AZ #022492)
601 Carlson Parkway, Suite 1050
Minnetonka, MN 55305
Tel: (952) 933-9655
Fax: (952) 487-0189
mark@heaneylaw.com

*Attorney for Plaintiff Taylor R. Nelson*

19

## ACKNOWLEDGMENT

The Plaintiff, by his attorney, acknowledges that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

**HEANEY LAW FIRM, LLC**

Date: **June 11, 2021**

Mark L. Heaney
(MN #333219, AZ #022492)
601 Carlson Parkway, Suite 1050
Minnetonka, MN 55305
Tel: (952) 933-9655
Fax: (952) 487-0189
mark@heaneylaw.com

*Attorney for Plaintiff Taylor R. Nelson*

20